In re BOSTON METROPOLITAN
BUILDINGS, Inc.

No. 71399.

United States District Court
D. Massachusetts.

Sept. 8, 1950.

844

R. Ammi Cutter, Boston, Mass., for petitioner.

Herbert Ehrmann, Boston, Mass., trustee.

WYZANSKI, District Judge.

1. Pursuant to Bankruptcy Act, c. X, § 169, 11 U.S.C.A. § 569, the trustee filed a plan of reorganization on June 30, 1950, to which minor amendments were made orally on July 26, 1950, and in writing the next day. On July 26, 1950, this Court held hearings on the plan as amended and on objections thereto. At the same time the Court received evidence including testimony, offered in accordance with § 197, 11 U.S.C.A. § 597, as to the value of the security of the mortgage bondholders. The day after the hearing the judge, having regarded the trustee's plan as worthy of consideration, submitted it as provided in § 172, 11 U.S.C.A. § 572, to the Securities and Exchange Commission for examination and an advisory report. September 1, 1950 the Commission filed its "report."

2. This Court finds that the fair value of the debtor's property known as the Wilbur Theatre the Metropolitan Building and the Metropolitan Theatre, and numbered 244–272 on Tremont Street, Boston, consisting of 56,417 square feet of land together with the buildings thereon is $2,300,000. These are the reasons for this valuation:

(a) Valuation of improved real estate, especially when it is used for the largest motion picture theatre in a six state area, leaves room for wide differences of opinion. The magnitude of the operation makes comparisons with other enterprises misleading. And even a tolerable degree of certainty is hard to achieve because of the effect upon the motion picture industry of the introduction of television, the possible repercussions of the Korean crisis, the speculative nature of changes in the national standard of living and in excise tax laws, and the possibility of price regulation and rationing or control of goods including gasoline for automobiles.

Under these circumstances the ultimate estimate of disinterested persons of wide experience, familiarity with the local area, business sagacity and sound judgment are more to be relied upon than a conclusion derived solely from a painstaking examination of each subsidiary item which such disinterested persons cited as the bases of their ultimate estimates. Qualified experts, like judges, often have better judgment than logic.

(b) There were several disinterested qualified estimates of ultimate value. One of the most impressive was the implied estimate of the numerous insurance companies and other lending institutions which considered that a sound figure for a first mortgage on the property would be $600,-000 if they were to make a loan, which they declined to do. One institution, the Massachusetts Mutual Life Insurance Company, seriously considered, although it ultimately did not offer, a loan of a little less than $1,100,000. These potential lenders would seem to have assumed that the value was between one and two million dollars.

(c) Another important estimate was made by an experienced local appraiser, Mr. Robert S. Wayland. This appraiser was appointed by the Court and had no known motive to make either a high or a low valuation. His ultimate appraisal was $2,000,000. Developments since he made his appraisal show he underestimated probable 1950 real estate taxes and overestimated 1950 moving picture theatre patronage, and to that extent overvalued the property. In other respects, such as a prediction of long range trends in the motion picture industry, he may have undervalued the property. However, his views seem to coincide with the contemporary judgment expressed indirectly in current stock market prices of motion picture securities. In any event, the Court is satisfied that if Mr. Wayland were to reconsider his testimony in the light of the criticisms which the Commission has directed at his analysis, Mr. Wayland would have no reason to vary his final valuation by more than 15%.

(d) The trustee himself stated that after a full consideration of all the factors, including certain tax appraisals of former years which he properly regarded as of secondary importance, he concluded that the property is not worth more than $2,-350,000. This estimate is impressive because the trustee has frequently demonstrated in this Court and at the bar sound judgment in the numerous important real estate transactions which he has handled and because in this case he like the Court has no motive except to do justice. While the Commission is, of course, equally free of any financial interest, it offered no expert appraisals and has no special familiarity with the local scene. Its opinion reflects the type of minute criticism which seems to me unpersuasive.

3. In addition to the security found to be worth $2,300,000 the debtor has excess working capital worth $200,000. Thus the debtor's total property is worth $2,500,000.

4. Interest aside the claims of the first mortgage bondholders are $2,350,000; of the second mortgage bondholders $1,106,-500; of governments for taxes $1,212; and of miscellaneous creditors $10,978. There are also claims of holders of voting trust certificates and of holders of warrants to purchase common stock; but these claims are without value and need not be taken into account in any plan.

5. There is nothing in the conduct of New England Theatres, Inc. before or during the reorganization which would make it proper to subordinate its rights to the rights of other holders of the first and second mortgage bonds.

(a) The trustee after a full study of the records of the debtor reached a conclusion that there was no improper conduct by New England Theatres, Inc. or those for whom it acted. The trustee, mindful of § 167(3), 11 U.S.C.A. § 567(3), reported this conclusion both formally and informally to the judge.

(b) The Commission's counsel at the hearing on July 26 stated that they had no evidence that the lease to New England Theatres was unfair. The Court specifically invited the Commission to offer any evidence to that effect. (R. 53.) The contrary statement in footnote 14, page 18, of the Commission's report must have been prepared by someone who, to take the most charitable view, was ignorant of what actually transpired. The Court admitted all the testimony that the Commission showed to be relevant. The attorneys for the Commission stated that they would like to have the record expanded "to introduce rather voluminous files * * *. The evidence deals with the acquisition of securities by the New England Theatres, Inc. and the debtor corporation. The Securities and Exchange Commission is not suggesting at this stage that there is anything wrong about either of these two items but they feel they would like to have an inspection of everything. They have seen the documents already." (R. 50.) In short, the SEC had inspected all the documents and had found nothing to criticise. Yet their counsel proposed to burden the record with voluminous, undigested material. Whatever practice the Commission may follow in its own proceedings, this Court does not admit evidence unless the proponent first shows its relevance and second reduces it to a manageable compass. Not the least virtue of the judicial process is that it assures a fair trial by sharpening the issues and thus allowing all parties to know precisely the nature of the case which they must meet and the Court must decide. A court trial is not a grand inquest motivated by unfounded suspicion.

(c) In its own "report" at page 39 the SEC states that "We do not contend that there is factual data showing overreaching or misconduct which would require a finding of subordination or limitation to cost of the claims of New England Theatres."

(d) The lease to New England Theatres, Inc. was a fair lease as is shown by the record of other leases of motion picture theatres, by the action of a disinterested group of directors of Metropolitan in approving it, and by the failure of any party including the SEC to rebut the presumption of regularity.

(e) Despite the unwarranted innuendoes at pages 49 and 50 and elsewhere in the Commission's "report", there was nothing improper in New England Theatres' purchase of $26,000 principal amount of first mortgage bonds for $1006 each. Before making the purchase, New England Theatres consulted the Court as to the purchase. The Court approved both the purpose and the manner of the purchase. New England Theatres was not in a fiduciary relationship to the Court or any party. It paid a fair value. It made purchases in a non-discriminatory way. Its motive was disclosed and was not contrary to any public policy. The SEC's criticism is unjustified.

(f) Except in so far as it chooses to subordinate itself, New England Theatres, Inc. is entitled to participate in a plan of reorganization upon the same basis as any other claimant with similar claims.

6. The plan after it has been amended in accordance with Findings 6(g) and 6(m) will be "fair", "equitable" and "feasible", in accordance with § 174, and will comply with the provisions of § 216, 11 U.S.C.A. §§ 574, 616.

(a) The first mortgage bondholders, except New England Theatres, Inc., will receive for each $1000 bond and accrued interest a new $1000 20-year bond and $6 in cash.

(b) The new bonds will be worth par in the light of the facts that they are part of an issue of $1,000,000, secured by property worth $2,300,000, that they bear fixed interest of 4½%, that the amortization of the bond issue is fixed at 2% per annum, and that New England Theatres, Inc., a solvent lessor, is obligated to pay the new

corporation a minimum rental of $195,000 for 20 years.

(c) Since the value of the assets which now secure the outstanding first mortgage bonds is $50,000 less than the principal amount of those bonds, each first mortgage bondholder will receive slightly more than the full amount of the principal of his claim, if his new bond is worth par, as the preceding finding states. The slight discrepancy allows for a tolerance in favor of the first mortgage bondholders.

(d) The first mortgage bondholders' claims for interest are unsecured because this Court has found that there was only $2,300,000 security for the $2,350,000 principal amount of first mortgage bonds. In this proceeding, therefore, the first mortgage bondholder can present his interest claim only against the unsecured assets. His claim is limited to the amount of interest which had accrued before December 14, 1949, the date the petition for reorganization was filed in this Court. That interest was at most $15 for each $1000 bond. A payment of 40% of $15 or $6 is at the same rate as payments to the unsecured bondholders and is, if anything slightly more than the first mortgage bondholder is strictly entitled to.

(e) The fixed interest rate of 4½% on the new bonds will be more favorable to the holder than the fluctuating rate upon the old bonds.

(f) The retirement of bonds at 2% per annum or $20,000 a year is at a sufficiently high rate. At the end of the 20-year period at least $400,000 in bonds will have been retired and if $600,000 bonds are outstanding, they will be adequately secured.

(g) However, the provision allowing the reorganized company to purchase bonds and to offer them at their principal amount instead of making cash payments to the sinking fund is undesirable and should be eliminated. It would make it possible for those having inside information or special relations with the corporation to have an advantage. The plan should be amended so that the indenture has a provision that the sinking fund should be handled by the indenture trustee who should re-deem bonds at principal amount only by call. The indenture should also provide that the reorganized company shall deduct annually from earnings on account of depreciation an amount not less than the $20,000 annual sinking fund. The restrictions which prohibit payments of dividends or the purchase of capital stock until the bond issue is reduced to $500,000 contribute toward the feasibility of the bond issue and are approved. In accordance with the expressed agreement of New England Theatres, as stated in the trustee's brief to this Court, the plan should be amended to provide that the indenture shall contain no exception which permits payment of dividends or purchase of capital stock out of the proceeds of subordinated loans.

(h) The second mortgage bondholders, except New England Theatres, Inc., will have for each $1000 bond $400 cash.

(i) This is more than fair to them. The SEC reported that "an allocation of approximately $200 to $300 per Second Mortgage bond would be warranted. It is clear, therefore, that the payment proposed under the plan is fair." (P. 51.) Other estimates would indicate that anything over $130 paid on each second mortgage bond would be generous.

(j) The government tax claims and the miscellaneous small creditors will be paid in full under the plan. This is fair to them.

(k) The holders of voting trust certificates and the holders of warrants to purchase common stock will receive nothing. Since creditors will not be paid in full, this is fair to them.

(l) There is nothing unfair or inequitable in that part of the plan which allows New England Theatres, Inc. in exchange for its $1,350,000 first mortgage bonds, $778,500 in second mortgage bonds and 52,145 shares of voting trust certificates to acquire the entire common stock in the new corporation rather than new bonds and cash like the other holders of the old bonds. The common stock, considered in its most favorable light, can under no appraisal be worth as much as would be bonds and cash given to New England Theatres on the

same basis as to other holders. Indeed, New England Theatres is receiving common stock which is probably the rough equivalent of only the value of its first mortgage bonds and is getting nothing for its second mortgage bonds or voting trust certificates. The Commission has made the unrealistic suggestion that perhaps some other first mortgage bondholder would like the same privilege as New England Theatres to receive common stock instead of bonds. But it is only the Commission that suggests this. Not even one bondholder whose money is at stake thinks his interest would be served by any such option. And the Court believes the unanimous judgment of the bondholders reveals the shrewdest estimate of their own advantage.

(m) There are certain miscellaneous changes in the plan which have been suggested by the SEC and which should be made for the greater protection of the mortgage bondholders and others.

1. The trustee initially and the new corporation thereafter should during a two-year period exercise every reasonable effort to locate holders of bonds who fail to exchange their securities in accordance with the plan.

2. After a five-year period, all unclaimed bonds should be cancelled and unclaimed cash should be applied as additional sinking fund on the new bonds.

3. The claims not settled or adjusted in the plan should be retained and enforced by the trustee, in accordance with § 216(13).

4. The plan should contain a provision for the approval of the initial board of directors and officers of the new corporation by the Court, in accordance with § 216(11).

5. The plan should contain a provision that the charter of the new corporation shall have provisions prohibiting the issuance of non-voting stock and requiring the submission of annual reports to stockholders, in accordance with § 216(12).

■ (n) It is not necessary that the plan should be amended so that the bonds issued by the new corporation shall be guaranteed by some other corporation. The new bonds, as already stated, are already worth the full principal amounts of the first mortgage bondholders' claims.

■ 7. In accordance with § 197 the Court fixes the classification of creditors set forth in Part IV of the plan as the proper division of creditors into classes for the purpose of the plan and its acceptance. Since New England Theatres, Inc. is receiving different, though in the Court's view less favorable, treatment than other security holders, it should be in a separate class.

8. The case is not yet in a posture which justifies the Court in directing the trustee to transmit information to creditors and stockholders, in accordance with § 175, 11 U.S.C.A. § 575.

(a) The following steps need to be taken.

1. The trustee must file the amendments to the plan set forth in above Findings 6(g) and 6(m).

2. The trustee must present to the Court an order approving the plan as amended, in accordance with § 174.

3. The trustee must present to the Court for approval a summary of the plan, in accordance with § 175(1).